1-16-0-7-95 State of Illinois, Clinton Avenue, Ms. Pamela J. Stelter Good morning. Ms. Stelter, you may proceed. Again, my name is Geneva Penson, and I am arguing on behalf of Appellant Kenneth Thompson. Mr. Thompson is convicted of threatening a public official and sentenced to the maximum extended term of 10 years in prison. He's raising two claims on appeal. First, that the state failed to prove him guilty beyond a reasonable doubt. And second, that the sentencing court disregarded important mitigation and otherwise abused its discretion. Today, I will discuss Mr. Thompson's reasonable doubt argument, and I will discuss the facts of the case in conjunction with that argument. Counsel, I have a question, and even before you begin your argument, please. At page 22 of your opening brief, you say that the defendant continued to stay at the VA hospital and receive psychiatric treatment, that there was absolutely no evidence he resisted or was forced to undergo psychiatric treatment. But he was admitted to a locked psychiatric unit at the VA hospital, was he not? Yes, he was, Your Honor. And does the record reflect that he could sign himself out? The record does not reflect whether or not he could sign himself out. However, the record does reflect that Mr. Thompson is the person who passed to see a psychiatrist and who was seeking psychiatric treatment upon his entry at the hospital. Well, he entered the hospital through the emergency room, did he not? Yes, he did. And the reason was for issues relating to cocaine, isn't that true? Or drugs? That is correct. And he was then admitted first to the medical floor to evaluate or diagnose an acute heart problem, is that correct? Yes, that's correct. And while he was being treated for that heart problem, he told the emergency room physician that he was feeling tired of living, and he asked to see a psychiatrist. Do we know, does the record reflect whether the hospital filed a petition for involuntary commitment? The record does not reflect whether that was done. So he couldn't just walk out of the facility, could he? Judge, we don't know that. There is no information indicating that there was any involuntariness to his psychiatric admission. And it wasn't until over a week later, on April 3rd, when there was a warrant issued for his arrest, or a warrant executed for his arrest. Other than he was in a locked psychiatric unit? Correct. We have no information that his admission or stay there was involuntary. Did he ever leave, other than with the officers on the warrant? He never left until he was arrested by a Glenview police officer. Okay. To prove the offense of threatening a public official, the state must prove beyond a reasonable doubt that the accused knowingly delivered or conveyed a threat to a public official by any means, either indirectly or directly. Under the relevant statute, a person acts knowingly when he is consciously aware that his statements are practically certain to be conveyed to the relevant public official. In this case, all of the circumstances surrounding Thompson's statements combined to show that the state's evidence was insufficient to prove that Thompson was practically certain that his statements would be conveyed to Justice Stanton McBride. Well, he is on the record indicating that he is very displeased with her. She's framed him. She's put him in jail for 12 years. And he rented a gun. He did all of these things and actually went to the Glenview station or maybe even her home several times, although it appears he never actually knocked on the door. Why? Why is it not reasonable for him to believe that somebody is going to pass that on to police or, in fact, Justice McBride? Judge, here's why. First of all, the evidence that it's not reasonable to think that he thought those statements would be conveyed to Justice McBride are in Kenneth Thompson's own statements. He said in the hospital to more than one doctor that he was tired of living. He felt that he was tired of living and he felt that he needed to save himself from himself. Yes, he did speak with multiple doctors there at the hospital, five or six psychiatry medical professionals, in fact. And during each of those statements, on March 16th, when he spoke to Drs. Durai and Connell, on March 17th, when he spoke with Dr. Rebecca Godkin, he made these claims to have been planning to harm Justice McBride. However, he never identified the person, he never identified Justice McBride. To those doctors during the first couple of days, he never identified anybody. He simply said that he had been wrongly convicted of rape and that he wanted to, 30 years prior, and he wanted to harm the prosecutor, the prosecutor. When did he first identify, was that, I don't know how to pronounce his name, but Nguyen? I believe he first, I believe it's Dr. Nguyen. Is that how you pronounce it? Thank you. And he, that doctor was the first person that Mr. Thompson identified Justice McBride. So that would be on the 19th? I don't know if it was on the 19th. The record does not reflect. In fact, Dr. Nguyen saw Mr. Thompson on March 19th, 20th, 21st, and 22nd. The record does not reflect when in those dates Mr. Thompson identified Justice McBride. He gave more and more details, however, to each of the doctors he saw. When I use doctors, I mean the residents as well and the medical student. But he gave enough detail so that he knew, he indicated it was Cook County. He gave the offense. He gave the year. He then would give additional details that he was able to ascertain she lived in Glenview. He indicated it was a woman. So he gave more and more details, although he didn't use the name until he gave the name to Dr. Nguyen. Judge, he did give those details. However, we have to be mindful of the fact that those details alone, that this prosecutor was a woman,  those don't do much to narrow down the possibilities about who Mr. Thompson was talking about. There are hundreds and hundreds of state's attorneys in Cook County, many, many, many state's attorneys in Cook County who have become judges and are currently on the bench. That is the norm in Cook County. Mr. Thompson didn't give them any case information about his case. He didn't give them any name. It's not reasonable to expect that those doctors would go and look up Mr. Thompson's case, find out who the lawyers were involved in his case, and try to convey what Mr. Thompson was saying to them. He was there to seek psychiatric treatment. Didn't he tell Dr. Nguyen, though, that it was McBride who named her? He did name McBride days later to Dr. Nguyen. And he did say that he wanted to go down with the judge and kill himself rather than go back to prison. He did say that in the past that had been his thoughts. But, again, he was there for the purpose of seeking psychiatric treatment, and that is another circumstance that makes it unreasonable to believe that he thought his statements would be conveyed to Justice McBride. Mr. Thompson thought that he was making statements which were privileged in nature to psychiatrists, doctors who were treating him. That is a reasonable assumption on his part, as it is well known that statements a person makes to a doctor or a psychiatrist are privileged under the law. Those statements generally are not to be told to third parties. So it is reasonable to think that Mr. Thompson thought what he was saying would go no further than that ruling. Now, would it be reasonable for him to believe that with these concerns, the doctors were hearing that they might tell their own security for their own safety, and then the security could follow up? Judge, Justice Hutchinson, pardon me, I don't know that that would be reasonable for him to believe, given that he wasn't making any threats toward these doctors. As a matter of fact, any, you know, threats that he was making to Justice McBride at that point seemed to be neutralized. He was talking about thoughts that he had had in the past and that he was trying to get away from at this point. So I don't think it would necessarily be reasonable to think that those doctors would be in fear for themselves or that they would contact law enforcement. And finally, as a paranoid, ultimately diagnosed as paranoid schizophrenic, as he had been diagnosed before, I guess when he was in Texas, possibly in VA care. He had been diagnosed in the 70s when he was in the military. Is it reasonable to believe that he would have any reasonable expectations of privacy and or announcement of this particular threat? Well, yes. In the past, he had received psychiatric treatment since the 70s. He had seen psychiatrists at various points. In Texas, he had been treated at the VA. And there is no indication that any of his prior disclosures to his psychiatric doctors had been disclosed to anyone else. So it is perfectly reasonable for him to believe that these conversations would be kept in confidence and for the purpose of his psychiatric treatment. I think it's also important when you're looking at Mr. Thompson's mental state to realize that he was, in fact, diagnosed with paranoid schizophrenia. And the doctors, at least involved in this case, testified that his mental disorder was marked by delusions or auditory and visual hallucinations. So that gives us another reason to believe that Mr. Thompson was not in a mental state of trying to convey a threat to Justice McBride, but rather trying to avert any threat or harm to Justice McBride. If you take a look at the content of Thompson's statements to his doctors and also during police interrogation, it just leads you to question whether anything he said was based in reality or whether it was the product of his unsound mind. Some of the things he told the psychiatrists and police personnel were pretty fantastical. He told them that he had encountered a random guy named White Guy on 95th Street and that that guy just happened to know that Justice McBride lived in Glenview. Well, it could be that he didn't want to disclose a name, that he had received that information from somebody he didn't want to tell the police about. But this was not his first time being involved with the criminal justice system. I mean, he related that he had been involved in Texas and had to report as a sex offender and was very frustrated by that system. So he was familiar with the criminal justice system, was he not? He was familiar with the criminal justice system. All the same, some of the things he said were off the wall. He told them he rented a gun and returned it after one of his trips to Glenview. At least one doctor he told that when he was eight years old, he shot and killed four people. He told one doctor that when he was released from the military, that was in the 70s, that Richard Nixon himself wanted him to stay. Richard Nixon didn't want him to be released from the military. So it's obvious that some of the things he was saying are the product of just the unsoundness of his mind. And then you also, again... Does that mean that somebody cannot then convey a threat if they're mentally ill? Or if they have a diagnosed mental illness? That is definitely not what I'm saying. But what I'm saying is in this case, all of these factors combine to show that Mr. Thompson was not practically certain that the things he was saying to his treating doctor would be conveyed to Justice McBride. Dr. Duvall testified that this was the first and only time in over 20 years that he ever reported such a threat. Isn't that correct? Yes, he did testify. And that's because he felt that it was not only a threat, but there had been actions taken to execute the threat. Isn't that correct? Isn't that what the record says? He did say that. However, all of those actions were in the past, before Mr. Thompson showed up at the hospital. And Mr. Thompson is not charged with any of those actions. And again, one has to wonder if any of those things even took place. But in any case, he's not charged with those prior actions. What he is charged with is knowingly conveying a threat to a public official. When would that threat have occurred? I mean, and you pointed out something that I was going to ask. The things that happened, if they happened, could have been charged but were not. Correct. So by the time he is charged, one of the things he says to the police officer is, Look, I'm not a threat to her anymore. Correct? That's right. But he's still angry. He said that to several police officers. But he gets angrier as the conversations go on, which might lead one to believe that there is still a threat. Well, Judge, I don't believe that's accurate. If you read the record, and I'm sure your honor has, he is angry during the conversations that he is having with the doctors there at the hospital. He seems to be working through his anger as he's receiving treatment. However, at the time that he is interrogated by a VA detective and two state troopers, he says, I'm no longer a threat to her. He seems that the situation seems to be calming down. The situation seems to be alleviating. What about the Glenview officers? I want to make sure that I'm absolutely accurate about this. I think it was Fogarty. Fogarty. It was. There were two. Yes. He said that he would never hurt anybody is what he said to the Glenview police officer who interrogated him. At that point, he also said both to police personnel at the hospital and the police department that he never had a gun ever in this case. It seems that he was calming down at that point, your honor. And that was the purpose of him going to the hospital. And I also have to say that I think there is an important policy reason here for this court to decide that the evidence in this case does not prove that Mr. Thompson knowingly conveyed a threat. What Mr. Thompson did when he was having these crazy thoughts of harming Justice McBride, what he did is what we want people to do. He didn't go ahead and carry out these crazy scenarios he had in his head. Instead, he sought psychiatric treatment. He himself went to the hospital, yes, for medical reasons, but while he was there, right there in the emergency room, he recognized the need to see a psychiatrist and he asked to see a psychiatrist. And he received treatment to avert any harm or threat to Justice McBride. Counsel, do we know from the record what treatment he received at the hospital? Is there anything whatsoever in the record that indicates that? Well, Judge, we know that he was speaking, one would have to presume, in therapy with various psychiatrists each day that he was there in the hospital. In terms of medication? Do we know that that was therapy as opposed to, I mean, when you're in the hospital for a medical reason, the doctor checks in once a day. Do we know that the visits from these various residents was anything more than that? Is there anything in the record that reflects he was getting medication or he was in individual therapy or group therapy while he was there? Judge, there's nothing reflecting whether or not he received medication. However, I would assert that given the lengthy conversations that Mr. Thompson had with the treating doctors, it would seem to me that it was more than just a check-in with him on a daily basis. But that's the conclusion, correct? Well, I believe that is the reference to be drawn from the record, yes. Counsel, if you want to sum up at this point, because your time is up. Okay. And you'll have an opportunity to reply. Okay. All of the circumstances that were brought out in evidence here, Mr. Thompson delivering himself to the doctor and asking for a psychiatrist, Mr. Thompson making his statements in what he believed, what anyone would reasonably believe to be a privileged manner, and also just the fact that what Mr. Thompson did is what we should encourage in people who are having violent homicidal or suicidal ideations, combined to show that there was no way that Mr. Thompson, or I'm sorry, the evidence is insufficient to show that Mr. Thompson was practically certain the things he was saying would be conveyed to Justice McBride. And for that reason, we are asking you to reverse his conviction outright. Thank you. Thank you. Mr. Spellberg. Thank you, Your Honor. Good morning again. Assistant State's Attorney Alan Spellberg representing the people of the state of Illinois. Kenneth Thompson was properly convicted of threatening a public official based upon the statements that he made repeatedly to the doctors at the Jesse Brown VA Hospital, to the members of the security of the Jesse Brown VA Hospital, to the police officers, to the Illinois State Police, and then the detectives from the Glenview Police Department, as well as an Assistant State's Attorney. And there were several things that we heard of in the record that the steps he took. Yes, Your Honor. Were any of those, were any charges related to those steps charged? No, Your Honor. All right. So the only charge we have is this, the threat charge? Yes, Your Honor. And when is this threat, are we charging for the threat that he wanted to do this, or that at the time of the execution of the warrant, I guess April 2nd, April 3rd, that he was, this threat was still valid? Your Honor, well, the indictment alleges, based on his statements of March 18th, 2013, about that time. The primary evidence that was offered to explain the defendant's threat to Justice McBride came from the conversations that the defendant had with Dr. Condell and Dr. Durai. And the reason why I stress that as the primary evidence is primarily Dr. Durai, placing in the proper context and the timeline counsel offered was not entirely correct. The defendant appears at the Jesse Brown VA Hospital on March 18th, 2013 to the emergency room complaining of essentially heart palpitations from having gone on a cocaine binge. While he's in the emergency room. Does he actually admit that or just heart palpitations, I'm not feeling well, I have heart palpitations? I believe that the record says that.  Right. Okay. The emergency room was March 16th. March, okay. It wasn't until the 18th that he said Dr. Durai. My timeline isn't correct as well, I apologize for that. But on March 18th, there was a counsel for a psychiatric review sent to the psych department, which is when Dr. Condell and Dr. Durai came, because of persistent homicidal ideations. That was the basis for the counsel. And when they go and speak to him, he then gives details about how he had been wrongfully convicted by a prosecutor, he was sentenced to the Department of Corrections for 12 years, he served in it, he identified her as a woman, and he said that he wanted to kill her. That she didn't care that he was innocent and he wanted to kill her. Dr. Durai, in his lengthy, nearly 20 years experience at that point, recognized that there was so much detail and the threat was so clear that it triggered the duty to warn, something that had never happened in his prior career. The statutory duty to warn that any mental health expert, any mental health professional has when they are seeing a patient or an individual who threatens somebody and identifies them with bodily harm and identifies them with enough specificity, there is a duty to warn law enforcement. Did you say this the first time in 20 years? That's what Dr. Durai testified to. That in his experience, this was the very first time because there was enough specificity, enough details in Kenneth Thompson's threats against the prosecutor. The next day, when he's meeting with that client... One question before you get to the next day. Does that duty to warn law enforcement, in this case, I guess it was VA security, who then carried out, or maybe there was someone else contacted, but VA security was first, I think. Is there any duty to notify the patient that this is being communicated? Under the statute, and cited in our brief, Section 6-103 of the Mental Health Code, a doctor can satisfy their legal obligation by notifying law enforcement. It's law enforcement's responsibility at that point to assess the threat, assess the risk, and decide what to do next. In this case, law enforcement decided to investigate a little bit further, determine whether or not this was a credible threat, which they did. That's why the detective at the VA hospital had the interview with the defendant, why the state police came, why the Glenview police came. They all determined that it was a credible threat and notified Justice McBride, notified Justice McBride through the Supreme Court's marshal service. Then Justice McBride was so concerned that she then went and filed a police report with the Glenview Police Department. So the facts as establishing show not only clear conveyance, actual conveyance of the threat to Justice McBride, which is a requirement. The facts show explicitly that Justice McBride was being threatened because of her role as a former prosecutor and current judge, because of her public existence. And the facts show that the defendant conveyed this information in a circumstance when he would reasonably know that it would be conveyed to her through the indirect mechanisms that he triggered. And the reason why I say that is because it is well known, it is established law, that when you are speaking to a mental health professional and you threaten someone with enough specificity, it is no longer privilege. The privilege is defeated by law, and the obligation to report triggers. Counsel, we say this in our brief, but yet counsel doesn't even respond to it in the reply brief at all. It is true that ordinary conversations with medical professionals are privileged, but the duty to warn trumps that and overcomes it. And that's what happened here. And that's why there had never even been a motion in limine to exclude the statement. There had never been a motion to suppress the statement because it was recognized in the trial court that the statements are admissible under the theory of the duty to warn. And that is why, in this case, before this court, the only question is whether or not the evidence in the light and most favorable of the prosecution establishes the defendant's guilt beyond a reasonable doubt. And the reason why I say that is because the evidence which was admitted, the statements made to Dr. Dorai, Dr. Condell, Dr. Winn, the detectives, the state's attorney, everyone, that has to be viewed by this court in the light and most favorable to the prosecution. Questions of admissibility, questions of manner in which the statements were taken or given are not really relevant to the question of whether or not they establish the element of knowing conveyance. So the statements in the record that I think Officer Fogarty and maybe Officer Heiser identify that the defendant said several times, I am not a threat to Justice McBride or I'm not a threat to that person. Are we to consider those two or because they're after the charge, they're not really relevant to this case? Your Honor, I would never say that they're irrelevant. They are a question of evidence going to the fact whether or not the defendant did truly threaten Justice McBride. And that was a question for the prior fact below to decide. You must consider all the evidence in the record, but you must consider it in the light and most favorable to the prosecution to give the deference to the trial judge who heard that evidence, who heard the weaknesses, and had to assess whether or not there were true threats in this case. And I would note that counsel doesn't contest the fact that there were true threats in this case, despite that being a very significant part of the defense below that was highly litigated below as to whether or not there were true threats. In her brief on appeal, in the opening brief in this case, they concede that there were true threats in this case. We point that out in our brief. The only question before this court is whether or not there was knowing conveyance. And in reply brief, they don't dispute that point in either way. So again, so there's no question of a true threat. There's no question of a public official. There's no question of actual conveyance. The only question here is was there a knowing conveyance. And under the Garcia case we submit, it clearly was a proper finding below that the evidence supports that point. Because in Garcia, much like here, the defendant made statements about threatening a judge to a court transport technician, to a sheriff's deputy. And what this court held was that it was reasonable to believe that by saying these statements to law enforcement that he was going to kill the judge, by saying those statements, that he knew that they would be indirectly conveyed to the judge in order to make sure that she was aware of the threat and could protect herself. Now, isn't Garcia distinguishable in that the threats there were made in much closer proximity to the time the defendant saw the judge and was in the judge's presence and the defendant there actually was in the judge's presence and made it when he was leaving the area to court personnel? So isn't Garcia distinguishable? Your Honor, I would say first off that that's sort of a question of interpretation slash facts for the prior fact to assess. But I would also say that the fact that in Garcia those statements were made almost immediately after being found in contempt by the judge, there was no opportunity for pulling off. It could have been viewed by the prior fact in the threatening public official prosecution or the appellate court that made it. He just wasn't given the opportunity. Defendant Kenneth Thompson, though, had 30 years to cool off about this case, and he didn't. Instead, he continued being angry at Justice McBride over that time, blaming her for what he thought was a wrongful conviction, blaming her for hiding evidence, keeping it from him, preventing him from being able to move to Asia with his girlfriend. He harbored this, and he continued to harbor it, even after he went to the Jesse Brown VA hospital because he did repeatedly say that he wanted to kill her. Even when he was in, after the arrest warrant was served, he was at the Glenview Police Department, and he did openly say, I'm not going to harm anybody. He did specifically say that day, I want to kill her. So the threat didn't dissipate. The desire to harm Justice McBride didn't dissipate. It was only when he's being asked about it by police officers that he is shading it ever so slightly. When he went to the hospital on, that was March 16th, right? I believe so, yes. And he was treated initially for the heart, the cardiac issue, and so forth. Did he request to see a psychiatrist? So the stipulated testimony that was offered by the defense, the sole evidence offered by the defense at trial, was stipulation from a doctor said that at the time of the medical admission, he said, I'm tired of living. But did he actually request to see a psychiatrist? I don't remember anything in the record specifically showing a request.  But I don't know that he actually said, I want to see a psychiatrist. I have just a reference in my notes from the testimony of Dr. DeRai. A cross-examination that he said that the defendant was indicating that he wanted treatment. Is that only in reference, or do you know, to that statement? I don't remember, Your Honor. I'm sorry. But, of course, the key is, in this case, as Judge O'Brien found below, there wasn't a mental health defense offered. There wasn't a basis of exclusion out of the space to have mental health. There wasn't any sort of consideration that he had an inability to form the records of mental state. Instead, the theory below, the arguments below as a trial judge, and what the judge found was that although the defense was arguing it wasn't a true threat, he truly did threaten Justice McBride. And so, therefore, this mental health history and these assertions of, say, President Nixon and things, which I believe came out in the PSI, not at the trial, none of those were a factor in the determination below because none of those were contested below. In the Garcia case, the threat to the judge comes right after the contempt. Yes. I'm going to, you know, we use the B word, we use the F word, I've got an AK-47, or I've got this, and he's going on and on to police officers. There aren't any actual doctors there, I don't believe. It's not related. But the threat comes and then the anger, and it is a threat he is going to act upon. In this case, we have, it's a little backwards. Or does the threat still exist? And this was sort of a timing question I asked Ms. Penson. He threatened, he said he wanted to kill her for, to doctors for at least six days before he was arrested, maybe more. We know about some specific days. By the time he's actually arrested, he's angry. He gets angry when he talks to Fogarty or Heizer, and I can't remember which one it is. But he says, I don't want to kill her anymore. I'm not a threat to her anymore. When is the threat? Your Honor, I believe, as I said, the threat for which he was prosecuted was the threat that he expressed to Dr. Durai and Dr. Condell on March 18th. But it was an ongoing threat. But at that time, he had absolutely no ability to carry out that threat. But the ability to carry out the threat has never been an element of the offense of threatening a public official. Much like in the Garcia case, the defendant had no ability to carry out his threat against the judge in that case because he was in custody. He would not have been able to do what he was threatening to do. But this offense is complete once you make that threat and it is conveyed to the target. And the reason why is because public officials need to be protected in order to do their jobs safely and securely. Because all public officials have to be able to act in their best interest, with their best judgment, without looking over their shoulder as to what might happen. And in this case, Kenneth Thompson made those threats, made it clear that he was threatening Justice McBride, made it clear what his desire was. Even though he didn't have the ability then to carry it out, his previous conduct shows that this was an ongoing anger, an ongoing rage against Justice McBride. And while he might not have been able to follow through on that threat for the next few days, who knows when that threat was going to occur. And that was why I would just point out the judge below, as part of the sentence, issued a stalking no contact order. And directed that it be continued against him, even if he were to be released from prison. All right, Mr. Thompson has been out of prison since March of this year. No, he's not. He's still officially in custody of the Illinois Department of Corrections. Because of his sexual offender background, he wasn't able to be released without an appropriate location. My information that I have, and I confirmed it yesterday, is that he is expected to be fully discharged from supervised release on September 21st. All right. Then in the interim, has he conveyed that threat again? Has there been any indication since his incarceration in April of 2013? Your Honor, obviously the record doesn't reflect anything like that. But in addition, I have no personal knowledge of anything like that at all. I do know that the stalking no contact order is being considered to be revived, but that's a different story. Was he subject to any treatment while in custody? I can't answer. Was that ordered? Not that I know of, Your Honor. But I'm sure you're well aware that it's very difficult for a circuit court judge to direct the Department of Corrections to provide any particular treatment. Because they never know what resources the Department of Corrections may have. I'm not aware of what treatment or any resources have been given to Mr. Thompson. All right. I just want to make sure I'm clear on this. The threat actually began when he saw the psychiatrist, not the emergency room doctor, correct? Yes. Okay. And he first named Justice McBride to Dr. Wynn, is that correct? Yes, on the 19th is my recollection. On the 19th. Okay. Thank you. So the day after speaking to Dr. Durai. Thank you. And if there are no further questions, the people of the state of Illinois respectfully request that this court affirm the defendant's conviction and sentence. Thank you. Thank you. The stipulated testimony of the emergency room doctor, Rodesha Capulon, says that Mr. Thompson not only said he was feeling tired of living, but he also asked to see a psychiatrist on March 16th, the first day that he was in the emergency room. And that is on page HH16 of the record. Yes, Dr. Durai did in fact contact the law enforcement there at the VA, the VA detective, but that did not occur until March 21st. That is on page AA72 of the record. Now, the state has. Well, by that time, they did have a name, is that correct? By that time, well, I'm not sure when exactly they got the name, because the name to the person that Mr. Thompson was upset with was given to Dr. Wynn, who saw him on the 19th, 20th, 21st, and 22nd. The record does not reflect on which of those days Mr. Thompson gave Dr. Wynn that name. Now, the state has argued, to your honors, that arguments we've made hint at questions of admissibility. They don't. They simply go to Mr. Thompson's mental state, whether he had the requisite knowing mental state at the time that he made these statements. Did he know that those statements would be conveyed to Justice McBride? That's why all of these questions about Mr. Thompson's mental state, his mental illness, his belief that he was speaking in confidence or under a privileged situation, that's why those things are relevant. They go to Mr. Thompson's mental state, whether or not it was knowing. So we are not raising any questions of admissibility here, whether evidence should have been suppressed. Those considerations are irrelevant on this issue. When you say we're looking at whether there was a knowing awareness. Correct. Right. So how does a mental illness affect whether somebody can be consciously aware that a result? I mean, we're getting into pretty specific and detailed information here that I'm not sure either this record reflects or we'd be speculating as lawyers and judges, would we not? Here, I'm not saying that a mental illness always necessarily prevents someone from having a knowing mental state. Certainly not saying that, but I'm simply saying that it's one of the considerations when you are looking at Mr. Thompson's mental state in this case. You have to also consider his mental condition. He suffers from paranoid schizophrenia. He seemed at this time to be in the middle of some sort of episode. At least he was hospitalized for that mental condition. Now, the state claims that that history of mental illness didn't come up until sentencing, but it did, in fact, come up earlier in his statements to the doctors, that he had been treated prior. So that he had been treated for mental illness prior to this date. So that is all a part of the evidence in this case and not just something that came up at sentencing. Do we have any of those VA records from Texas? I seem to recall there was some difficulty in getting them at the time.  However, at least Dr. Rebecca Godkin did check to verify that he had been treated at the VA in Texas. Now, the state is arguing that... The state has made some arguments about the admissibility of Mr. Thompson's statements in light of the fact that he could reasonably believe that they were privileged. And again, we're not arguing about admissibility here. What we are saying is that the average person, Mr. Thompson, the average non-lawyer person, believes that he has a privileged relationship, that the things that he says to his psychiatrist, to his doctor, are said in confidence and cannot be repeated to a third party. You can finish that. Yes, there are exceptions. There are legal exceptions to the rule of privilege. However, they are not, those technicalities are not reasonably expected to be known to the average citizen, the average non-lawyer, the average non-doctor. So the fact that Dr. Durai felt he had this duty to warn and did warn someone days after he spoke with Mr. Thompson do not necessarily go to Mr. Thompson's mental state of whether or not he was knowingly conveying a threat to Justice McBride. My time is up. And we'll ask you again to reverse Mr. Thompson's conviction. Thank you. Thank you. All right. Thank you, counsel, for your arguments. Thank you for your tribunal. And we will take the matter under consideration. We will have a decision in due course.